**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HI-MED LLC,<br><br>                                    Plaintiff,<br><br>            v.<br><br>iANTHUS CAPITAL HOLDINGS, INC.,<br>GOTHAM GREEN PARTNERS LLC,<br>HADLEY C. FORD, JULIUS JOHN<br>KALCEVICH, RANDY MASLOW,<br>ELIZABETH STAVOLA, ROBERT GALVIN,<br>and JASON ADLER,<br><br>                                    Defendants. | CIV. NO.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff HI-MED LLC ("Plaintiff" or "Hi-Med"), by and through its attorneys, Riker Danzig Scherer Hyland & Perretti, LLP, by way of Complaint against Defendants iAnthus Capital Holdings, Inc. ("iAnthus" or the "Company"), Gotham Green Partners LLC ("GGP"), Hadley C. Ford ("Ford"), Julius John Kalcevich ("Kalcevich"), Randy Maslow ("Maslow"), Elizabeth Stavola ("Stavola"), Robert Galvin ("Galvin"), and Jason Adler ("Adler"),[1] hereby alleges as follows based on personal knowledge as to itself and its own acts; an investigation, which includes, among other things, a review of public documents, media reports, public filings with the Canadian Securities Administrators (the "CSA") on the SEDAR internet-based disclosure system ("SEDAR"), wire and press releases published by and regarding iAnthus, securities analysts' reports and advisories about the Company, review of other filed lawsuits, and publicly-available information on the Internet; and upon information and belief as to all other matters:

---

[1] Collectively iAnthus, GGP, Ford, Kalcevich, Maslow, Adler, Stavola, and Galvin are referred to as "Defendants" and collectively Ford, Kalcevich, Maslow, Adler, Stavola, and Galvin are referred to as the "Individual Defendants".

## NATURE OF THE ACTION

1.      Since at least May 2018, GGP and its principal Adler have conspired with iAnthus to misrepresent financings totaling more US$100 million as arms-length transactions when they were, in fact, obtained through improper insider self-dealing, including undisclosed loans provided to iAnthus' former Chief Executive Officer Ford in violation of both Company policies and his obligations as an officer and director of the Company.

2.      The apparent legitimacy of these financings permitted iAnthus to (i) present itself as a well-capitalized and growing company poised to be a leader in the ever-expanding medical cannabis industry; and (ii) merge with another cannabis company, MPX Bioceutical Corporation ("MPX").

3.      GGP's financial backing also allowed iAnthus to deceive additional investors – tellingly always subordinated to GGP – into funding iAnthus' operations and supposed growth.  Recent disclosure of these irregular loans and other allegations reveals that GGP's so-called investment was illusory and GGP essentially bribed iAnthus management to do its bidding to the detriment of all other investors.  Defendants' misconduct resulted in iAnthus defaulting on all of its debt obligations. Additionally, the belated revelation of the inappropriate loans and other misconduct alleged below caused a rapid and unprecedented 62%, one-day, decline in the value of iAnthus stock.

4.      Hi-Med, iAnthus' largest single shareholder and owner of a US$5,000,000 debenture, brings this action to hold Defendants accountable for their misconduct.[2]

---

[2] Hi-Med reserves its right to pursue other remedies available under Canadian law, in a Canadian court.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act, 17 C.F.R. § 240.10b-5.

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1331, and  28 U.S.C. § 1367, pursuant to which this Court may exercise supplemental jurisdiction over the state claims contained herein as part of the same case or controversy.

7.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  iAnthus maintains principal executive offices in this District and many of the acts and transactions alleged herein, including the dissemination of materially false and misleading information, occurred in substantial part in District.

8.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

9.      Plaintiff Hi-Med is a limited liability company organized under the laws of Florida, with its principal office located at 1001 North U.S. Highway 1, Suite 800, Jupiter, Florida 33477. With 14,048,215 iAnthus shares, Hi-Med is the Company's largest shareholder.  Hi-Med also holds a US$5,000,000 investment in debentures issued by iAnthus.

10.     Defendant iAnthus is incorporated in Canada, with its registered office located at Suite 1500, 1055 West Georgia Street, Vancouver, British Columbia, Canada, V6E 4N7, and its principal executive offices at 505 Fifth Avenue, 23rd Floor, New York, New York 10017. The

Company's common shares are listed on the Canadian Stock Exchange under the trading symbol "IAN," and trade in the United States over-the-counter on the OTCQX, part of the OTC Markets Group, under the trading symbol "ITHUF." iAnthus owns and operates licensed cannabis cultivation, processing and dispensary facilities throughout the United States, providing investors diversified exposure to the regulated cannabis industry in the United States.

11.     Defendant GGP is a private equity firm that was founded in January 2017 and focuses on deploying capital into cannabis and cannabis-related enterprises.  GGP maintains its primary offices at 1437 4th Street, Suite 200, Santa Monica, CA 90401.  On May 14, 2018, GGP entered into a Secured Debenture Purchase Agreement (the "2018 Debenture Agreement") with iAnthus, which provided for US$40 million in secured debenture financing and a concurrent US$10 million equity financing agreement with GGP (the "2018 Debenture").  On or about September 30, 2019, GGP entered into a non-brokered private placement offering of US$20.0 million 13% secured notes (the "2019 Debenture") under an Amended and Restated Secured Debenture Purchase Agreement between the Company and GGP (the "Amended Debenture Agreement").

12.     Defendant Ford is the co-founder of the Company and was Chief Executive Officer and a director of iAnthus until he was forced to resign from these positions on April 27, 2020 due to his misconduct.  Defendant Ford signed the 2018 Debenture Agreement and the Amended Debenture Agreement on behalf of iAnthus.

13.     Defendant Maslow is the co-founder of the Company and is currently the Interim Chief Executive Officer and a director of iAnthus.  Prior to April 27, 2020, Maslow was President and a director of the Company.

14.     Defendant Kalcevich is, and at all times relevant hereto has been, the Chief Financial Officer of the Company.  Defendant Kalcevich signed the 2018 Debenture Agreement on behalf of iAnthus.

15.     Defendant Stavola currently serves as Chief Strategy Officer of the Company and is a director of iAnthus.  Prior to assuming her role at iAnthus, Defendant Stavola was a director of MPX.  Defendant Stavola is, and at all times relevant hereto has been, the beneficiary of the Elizabeth Stavola 2016 NV Irrevocable Trust (the "Stavola Trust").

16.     Defendant Galvin was a director of iAnthus from February 2019 until his resignation on December 5, 2019, and, upon information and belief, is currently an employee of the Company.

17.     Defendant Adler is, and at all times relevant hereto has been, the Managing Partner of GGP. Defendant Adler signed the 2018 Debenture Agreement and the Amended Debenture Agreement on behalf GGP.

## BACKGROUND

18.     iAnthus was founded in September 2014 by Defendants Ford and Maslow to capitalize on the rapidly growing regulated cannabis market in the United States by providing capital investment and expert management services to licensed cannabis cultivators, manufacturers, and dispensaries.

19.     In particular, iAnthus is structured as a holding company and, through wholly-owned subsidiaries, the Company "provides investors diversified exposure to best-in-class licensed cannabis cultivators, processors and dispensaries throughout the United States" by "acquir[ing] and operat[ing] a diversified portfolio of cannabis licenses and investments for its shareholders." (iAnthus Management's Discussion and Analysis, Third Quarter 2017.)

20.     Since its inception, iAnthus has been heavily leveraged and dependent upon equity and debt financing to fund its aggressive expansion.  iAnthus has routinely, throughout its history, issued statements showing that the Company's business operations, financed through various debt and equity offerings, were expanding throughout the United States.

I.    **The Conspiracy**

21.    In May 2018, just a little over one year after GGP's founding, GGP became iAnthus' primary funding source by entering into the US$50 million 2018 Debenture Agreement (a US$40 million secured debenture financing and concurrent US$10 million equity financing). The 2018 Debenture Agreement was filed with the CSA on May 24, 2018 and made publicly available on SEDAR.

22.    iAnthus touted the 2018 Debenture Agreement as the largest investment to date by a single investor in a publicly traded U.S. cannabis operating company.  While Adler claimed at the time that GGP's sizeable investment was due to iAnthus' "compelling growth and investment opportunity" (iAnthus Press Release, May 14, 2018), it was later revealed that it and the favorable terms obtained by GGP were the result of Adler's improper insider deals with Ford.

23.    Among the favorable terms for GGP was the withholding and escrow of US$5,722,222.22 (the "Escrowed Funds") from the 2018 Debenture proceeds to pay one year's interest on the 2018 Debenture – which were senior secured obligations -- in the event of an iAnthus default that effectively insured payments to GGP.  The 2018 Debenture Agreement, in pertinent part, provided:

> <u>Interest Escrow</u>. On the Closing Date, the Lenders, the Company and the Issuer shall enter into an escrow agreement (the "**Escrow Agreement**") with Skylaw Professional Corporation (the "**Escrow Agent**") pursuant to which the Escrow Agent will hold back US$5,272,222.22 (the "**Escrowed Interest Payment**") from the Proceeds in an escrow account held by the Escrow Agent (the "**Interest Payment Escrow**") to ensure the timely payment of one (1) year's accrued interest on the Debentures in the event that the Issuer does not have sufficient funds to satisfy such interest obligations in accordance with the Debentures. If the Issuer does not have sufficient funds to satisfy such interest obligations under the Debentures, whether during the first year of the term of the Debentures or thereafter, then the Issuer and the Lenders shall direct the Escrow Agent in writing in accordance with the Escrow Agreement to release the funds from the Interest Payment Escrow to satisfy

such interest obligations. The Interest Payment Escrow, or the portion held in trust, shall be fully released by the Escrow Agent, after payment of all fees and other obligations under the Escrow Agreement, in accordance with the Escrow Agreement (a) to the Lenders promptly upon notice to the Escrow Agent of the occurrence of the Event of Default, (b) to the Issuer as directed by the Issuer and the Lenders if the Issuer has not used the Interest Payment Escrow to satisfy interest on the Debentures for two consecutive financial quarters during the second year of the term of the Debentures, provided that the Issuer has satisfied all interest obligations under the terms of the Debentures and is not in default thereunder, or (c) to the Issuer as directed by the Issuer and the Lenders on the Maturity Date of the Debentures (as defined therein), provided that the Issuer has satisfied all Obligations under the terms of the Debentures and is not in default.

*Id.* §4.20(i) (emphasis in original).

24.     Despite this requirement, it was later revealed that the escrow was either not established and/or not used for its required purpose.  On information and belief, GGP and Adler obtained this preferential position in iAnthus through improper insider dealings.

**A.      Expansion Through Deception**

25.     Armed with this new round of funding and backed by GGP, iAnthus almost immediately identified MPX as an acquisition target and by October 2018 – a mere four months after GGP's cash infusion -- the two companies had entered into an arrangement agreement (the "Arrangement Agreement") that the Company billed as "the largest public cannabis transaction to date in the United States."  On October 26, 2018, iAnthus filed a copy of the Arrangement Agreement with the CSA on SEDAR.

26.     The Arrangement Agreement between MPX and iAnthus, dated October 18, 2018, among other things, provided for the conversion of MPX's debt and equity into iAnthus common shares (the "Arrangement Transaction").  In connection with the execution of the Arrangement Agreement, iAnthus also induced Hi-Med to enter into a voting agreement requiring Hi-Med to support of the Arrangement Transaction and vote in favor of it.

27.     As part of the Arrangement Agreement, iAnthus also assumed a long-term note payable to the Stavola Trust.  The principal amount of the note was US$10,000,000 and it had an

interest rate of 8.0%. with a maturity date of January 19, 2020.  Repayment of the note was secured by the assets of certain subsidiaries of the Company.

28.     Hi-Med was both a shareholder and bondholder of MPX and as a result of the conversion received 9,151,913 common shares of iAnthus on March 16, 2019, and an additional 4,896,302 shares on April 17, 2019.  Hi-Med's ownership of its iAnthus shares was memorialized in Direct Registration Certificates sent to Hi-Med in the United States.

29.     Unlike Hi-Med's interests, GGP's debt was not converted into equity by the Company but instead remained in a preferred senior secured position.

30.     In agreeing to vote in favor of the Arrangement Transaction and the conversion, Hi-Med relied on, among other things,  iAnthus' representations in the Arrangement Agreement:

- Since the date of the last iAnthus Group Filing, other than the transactions contemplated by this Agreement, there has not been any event, occurrence, fact, effect or circumstance that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect with respect to iAnthus Group (Schedule D(r));

- All accounting and financial Books and Records of iAnthus Group have been maintained in accordance with sound business practices (Schedule D(u));

- iAnthus Group has performed the obligations required to be performed by it to date under its Material Contracts (Schedule D(cc(i)));

- iAnthus is not in breach of or default under any of its Material Contracts (Schedule D(cc(ii))); and

- Except for Contracts made solely among iAnthus Group, iAnthus Group does not have any Non-Arm's Length Agreements and no non-scheduled payments (including payments in connection with the termination of a Non-Arm's Length Agreement) have been made under any Non-Arm's Length Agreement since December 31, 2017, except as set out in Section 3.2(mm) of the iAnthus Disclosure Letter (Schedule D(mm)).

31.     Following its acquisition of iAnthus shares, and relying on both the representations of iAnthus and GGP as to the legitimacy of the 2018 Debenture Agreement and the existence of an

escrow to protect against defaults on bond payments, Hi-Med, in March 2019, purchased US$5,000,000 in Unsecured Convertible Debentures (the "Hi-Med Debenture") from iAnthus.

32.     Pursuant to the March 2019 Hi-Med Debenture Agreement (the "Purchase Agreement"), iAnthus, *inter alia*, agreed to make quarterly interest payments to Hi-Med upon the terms and conditions of the Hi-Med Debenture. Also pursuant to the Purchase Agreement, iAnthus represented:

- The Disclosure Documents are, as of the date of such information, true and correct in all material respects and do not contain a misrepresentation, and no material fact or facts have been omitted therefrom where such omission would make such information materially misleading (4.15(c)); and

- There are no off-balance sheet transactions, arrangements or obligations (including contingent obligations) of the Company or any Subsidiary with unconsolidated entities or other persons that could reasonably be expected to have a Material Adverse Effect (4.15(e)).

33.     Lastly, the Purchase Agreement contained, among others, the following "Events of Default":

- Default in the payment (i) when due of principal of the Debenture, or (ii) of any interest or any fees or any other amounts payable by Company to Lender hereunder or in the payment of any other Liabilities due from Company to Lender, in each case under this subclause (ii) within ten (10) Business Days of then due (Section 6.1(a)); and

- Company shall fail to comply with or to perform in any material respect any provision of any of the Transaction Documents to which it is a party and such failure shall continue beyond any applicable grace period; or any of the Transaction Documents shall fail to remain in full force and effect except as expressly provided therein; or any action shall be taken to assert the unenforceability or invalidity of any of the Transaction Documents (Section 6.1(e)).

34.     Similarly, under the Hi-Med Debenture, iAnthus agreed to keep adequate and accurate records and books of account in which complete entries would be made reflecting all financial transactions (Article 6, Section 6.1(3)) and promptly pay when due all principal, interest and other amounts owed to Hi-Med (Article 6, Section 6.1(5)). The Hi-Med Debenture also provided for various "Events of Default", including:

9

- Section 7.1(1)(b) of Article 7 declares iAnthus in default in the event that iAnthus fails to pay Hi-Med "any interest or other amount" owed by iAnthus to Hi-Med "when due."

- Section 7.1(1)(c) of Article 7 declares iAnthus in default in the event that iAnthus "fails to … comply with any … covenant … contained herein or is otherwise in default of any of the provisions contained herein," and "such default, if capable of being remedied, is not remedied within ten (10) days after [iAnthus] receives written notice of such default from [Hi-Med]."

- Section 7.1(1)(d) of Article 7 declares iAnthus in default if iAnthus "shall generally fail to pay, or admit in writing its inability or unwillingness to pay, debts as they become due[.]"

- Section 7.1(3) of Article 7 provides that if iAnthus defaults "for any reason, whether voluntary or involuntary, and be continuing, [Hi-Med] may by notice to [iAnthus] declare all or any portion of the outstanding Principal Amount of [the Hi-Med] Debenture and accrued interest on this [Hi-Med] Debenture to be due and payable, whereupon the full unpaid amount of this [Hi-Med] Debenture which shall be so declared due and payable shall be and become immediately due and payable without further notice, demand or presentment."

35.    Hi-Med's investment in March 2019 was part of a US$35 million private placement, with the remaining US$30 million being purchased by Oasis Investments II Master Fund Ltd. ("Oasis").

36.    On May 2, 2019, weeks after the Hi-Med and Oasis investments, iAnthus tapped Oasis for an additional $25 million in order to feed its apparently insatiable appetite for cash through a private placement of notes that, like the US$35 million financing in March 2019, were all subordinated to the 2018 Debenture for GGP's benefit.

37.    Upon information and belief, both the US$35 million and US$25 million private placements were brokered by David Rosinov of Star Capital Management, LLC, who provided undisclosed loans to Ford in connection with these and possibly other transactions.

38.    As a result of these transactions, Hi-Med's investment in MPX was converted to equity, making it the largest equity holder in iAnthus' common shares.  Hi-Med also maintained its US$5,000,000 unsecured debt position subordinated to GGP's senior secured position. Because

of these machinations, GGP stood in a preferred position to Hi-Med in the event the equity value declined and/or iAnthus was unable to meet its debt obligations.

**B.     Ford Confirms His Capacity for the Unscrupulous**

39.     On May 24, 2019, soon after securing US$60 million in unsecured financing, iAnthus was sued by Walmer Capital Limited ("Walmer") for failing to redeem Walmer's MPX debentures.  In connection with this suit, and demonstrating his practice of making improper side deals, Ford was accused of and admitted to meeting with a representative of a separate group of debenture holders from South Africa and providing the representative with previously undisclosed information relating to (i) the timing of the redemption, and (ii) financial calculations that would allow these South African investors to maximize their return prior to the announcement of the redemption in preference to other similarly situated stakeholders.

40.     Upon information and belief, Ford further displayed his propensity for misconduct by, among other things, (i) miscalculating amounts owed to former MPX bondholders; (ii) engaging in personal share sales; and (iii) repricing warrants held by directors.

**C.     GGP Doubles-Down On Its Secured Position**

41.     On September 30, 2019, iAnthus and GGP entered into the Amended Debenture Agreement, which provided an additional US$20 million to the Company.  The Company issued a press release announcing that it had entered into a second financing agreement with GGP by "complet[ing] a non-brokered private placement offering of . . . US$20.0 million 13% secured notes which are exchangeable into common shares of iAnthus due May 21, 2021 . . . to [GGP]." The purchase agreement provided GGP with the right to purchase up to an additional US$66.5 million senior secured notes on the same terms and conditions as the private placement. GGP also waived its right to receive the quarterly cash interest payment of US$1,357,777.78 under the 2018 Debenture Agreement, and agreed to a "payment in kind" on September 30, 2019, which was

accrued and added to the principal amount of the notes under the 2018 Debenture. On October 10, 2019, iAnthus filed a copy of the Amended Debenture Agreement with the CSA on SEDAR.

42.     The Amended Debenture Agreement retained the provision from the 2018 Debenture Agreement that provided for the withholding and escrow of US$5,722,222.22 to protect GGP's interest by providing to pay one year's interest under the Amended Debenture Agreement in the event of an iAnthus default, stating:

> Interest Escrow. On the Closing Date, the Lenders, the Company and the Issuer shall enter into an escrow agreement (the "Escrow Agreement") with SkyLaw Professional Corporation (the "Escrow Agent") pursuant to which the Escrow Agent will hold back US$5,272,222.22 (the "Escrowed Interest Payments") from the Proceeds in an escrow account held by the Escrow Agent (the "Interest Payment Escrow") to ensure the timely payment of one (1) year's accrued interest on the Debentures in the event that the Issuer does not have sufficient funds to satisfy such interest obligations in accordance with the Debentures. If the Issuer does not have sufficient funds to satisfy such interest obligations under the Debentures, whether during the first year of the term of the Debentures or thereafter, then the Issuer and the Lenders shall direct the Escrow Agent in writing in accordance with the Escrow Agreement to release funds from the Interest Payment Escrow to satisfy such interest obligations. The Interest Payment Escrow, or the portion then held in trust, shall be fully released by the Escrow Agent, after payment of all fees and other obligations under the Escrow Agreement, in accordance with the Escrow Agreement (a) to the Lenders promptly upon notice to the Escrow Agent of the occurrence of an Event of Default, (b) to the Issuer as directed by the Issuer and the Lenders if the Issuer has not used the Interest Payment Escrow to satisfy interest on the Debentures for two consecutive financial quarters during the second year of the term of the Debentures, provided that the Issuer has satisfied all interest obligations under the terms of the Debentures and is not in default thereunder, or (c) to the Issuer as directed by the Issuer and the Lenders on the Maturity Date of the Debentures (as defined therein), provided that the Issuer has satisfied all Obligations under the terms of the Debentures and is not in default. Notwithstanding the preceding sentence and the terms of the Escrow Agreement, the Lenders, the Company and the Issuer may by joint, irrevocable direction direct that the Escrow Agent release the Interest Payment Escrow to the Company in accordance with the terms of the Escrow Agreement.

Amended Debenture Agreement § 4.20(i).

43.     Despite this representation, the escrow was either not established or not used for its required purpose.

44.     On December 20, 2019, the Company announced the closing of an additional US$36.15 million of senior secured convertible notes from GGP and additional co-investors.  This investment by GGP was the so-called "Third Tranche" of the financing plan announced on September 30, 2019.

45.     Unbeknownst to Hi-Med, or any other investors, a day after the close of the Third Tranche, Ford secretly borrowed US$100,000 from Adler of GGP and US$60,000 from another non-arm's length party, David Rosinov.  These undisclosed loans call into question iAnthus' entire relationship with GGP beginning with the 2018 Debenture.

## II.     The Conspiracy Begins to Unravel

46.     As 2020 began, iAnthus found itself under increasing pressure to identify additional funding for its aggressive expansion and, following repayment of the $10.8 million loan to Stavola, was facing financial strains.  Investors began to question whether iAnthus would have sufficient cash to meet its debt obligations that had increased by almost US$100 million in 2019.

47.     Rather than engage with investors with regard to these legitimate concerns, and in an effort to continue to deceive Hi-Med and other investors as to its activities, on or about February 27, 2020, iAnthus took the extraordinary step of suing Oasis and announcing that it had:

> filed a Statement of Claim (the "Claim") in the Ontario Superior Court of Justice against Oasis Investments II Master Fund Ltd. ("Oasis"). iAnthus filed the Claim in the interests of defending the Company against interference with the Company's financing and business by an unsecured lender who is seeking to better its position at the expense of the Company's shareholders and other stakeholders.
>
> Oasis was issued an unsecured convertible debenture (the "Unsecured Debenture") in the principal amount of US$25 million in connection with the Company's offering of unsecured convertible note units announced March 18, 2019 and May 2, 2019 (the "Offering"). Since closing of the Offering, Oasis has consistently agitated iAnthus with unfounded allegations

and self-interested proposals, all with the goal of renegotiating the terms of the Unsecured Debenture. Recently, Oasis has alleged that iAnthus breached certain debt covenants and that an event of default has occurred. iAnthus vehemently disagrees that there is currently, or has ever been, an event of default and is confident that iAnthus has complied with all covenants under the Unsecured Debenture. While iAnthus believes that Oasis' allegations are entirely unfounded, Oasis' behavior has interfered with iAnthus' ongoing financing activities and the Company's business.

Remedies sought by iAnthus include a declaration that iAnthus is not in breach of its obligations under the Unsecured Debenture (and related purchase agreement), damages, and a court ordered injunction restraining Oasis from making further false or misleading statements about iAnthus and otherwise interfering with iAnthus' contractual relationships.

48.     The press release quoted Defendant Kalcevich as stating:

After good faith efforts led by iAnthus' management, it is highly regrettable that we have been forced to take this action against Oasis.  Unfortunately, Oasis, which has a long history of taking activist measures to better its position through the courts and other means, has decided it would try the same tactics with iAnthus. We are disappointed with Oasis' attempt to extract value at the expense of our shareholders and other stakeholders, and we will pursue any and all remedies available to us as a result of Oasis' self-interested behavior.  We are in active discussions with a variety of financing sources, including significant existing lenders and investors who continue to believe strongly in the prospects of both iAnthus and the broader industry...

49.     On March 16, 2020, iAnthus issued a press release disclosing that Oasis had filed a

Statement of Defence and Counterclaim against the Company. The press release stated:

Remedies sought by that of Oasis within the counterclaim include the admission by iAnthus that they are in breach of their obligations under the unsecured debentures, and a declaration that the company has acted in a manner that is oppressive to Oasis. Oasis is also seeking a court order for a payment of funds which covers the unsecured convertible debenture, applicable interest, as well as expenses and fees in full. iAnthus finds the counterclaim to be without merit.

The court case is in relation to a March 2019 unsecured convertible debenture, for which Oasis Investments subscribed to for $25.0 million. In the time since, iAnthus alleges that the lender has repeatedly agitated the company with unfounded allegations and self interest proposals as a means of bettering their investment within iAnthus.

The firm has allegedly attempted to renegotiate the terms of the unsecured convertible debentures a number of times as a result of the fall out in

14

iAnthus' share price over the period. Oasis also alleges that debt covenants have been breached and an event of default has occurred, which is believed to be in connection with a recent investment by Gotham Green Partners.

50.     While attacking Oasis, iAnthus set about to find sources of additional funding because it likely recognized that it was facing a liquidity crisis despite its public protestations to the contrary.  In late March 2020, Ford even went so far as to approach Hi-Med to request additional cash from Hi-Med.

51.     It was later learned that around this same time, in March 2020, Defendants Ford and Maslow had begun exploring a potential management buyout offer (the "Potential MBO") in coordination with GGP.  Based on materials detailing the Potential MBO, GGP's investments would have been purchased at a *3% premium* while the investments of other bondholders (including Hi-Med) would be purchased at a *40% discount*.

## III.     The Truth Is Revealed

52.     On March 31, 2020, just three weeks after the announcement concerning the filing of the Oasis counterclaim predicting a default, iAnthus failed to make interest payments due to debtholders, including but not limited to Hi-Med, thereby triggering the "Events of Default" defined in Section 6.1(a) and (e) of Article 6 of the Purchase Agreement and Section 7.1(1)(b) and (c) of Article 7 of the Hi-Med Debenture.

53.     On April 6, 2020, iAnthus announced that it did not make the applicable interest payments to GGP under the Amended Debenture Agreement that were due on March 31, 2020 and that the Company had formed a special committee (the "Special Committee") to investigate wrongdoing, an investigation which ultimately led to the ouster of Ford.

54.     While the Company ascribed its inability to make the payments to the "decline in the overall public equity cannabis markets, coupled with the extraordinary market conditions that began in Q1 2020 due to the novel coronavirus known as COVID-19 ("COVID-19") pandemic"

that caused liquidity constraints for iAnthus, it became clear that the escrow created to cover this payment was either never established or not used for its intended purpose and that the default resulted from a conspiracy between GGP and iAnthus' conflicted management.

55.     In fact, iAnthus' default announcement was coupled with the revelation that the Company had formed the Special Committee to investigate related-party transactions involving Ford and review strategic alternatives available to the Company.  The Company's press release stated:

> The Board of Directors (the "Board") has formed a Special Committee, comprised of the five independent, non-management directors. The Special Committee was formed to:
>
> 1.     investigate any potential conflicts of interest and/or required disclosures with respect to the Company's CEO and certain related parties; and
>
> 2.     with a view to the best interests of the Company, explore and consider strategic alternatives available to the Company in light of the prospective liquidity requirements of the Company, the condition of the capital markets affecting companies in the cannabis industry and the rapid change in the state of the economy and capital markets generally caused by COVID-19, including but not limited to:
>
> a. renegotiation of existing financing arrangements and other material contracts, including any amendments, waivers, extensions or similar agreements with the lenders to and/or stakeholders of the Company and/or its subsidiaries that the Special Committee determines are in the best interests of the Company and/or its subsidiaries;
>
> b. managing available sources of capital, including equity investments or debt financing or refinancing and the terms thereof;
>
> c. implementing the operational and financial restructuring of the Company and its subsidiaries and their respective businesses, assets and licensure and other rights; and
>
> d. implementing other potential strategic transactions.

56.     Defendants Ford and Maslow had recused themselves from the Board meeting in which the Special Committee was appointed because at the start of the meeting they had revealed their involvement in planning the Potential MBO.

57.    Neither the Company nor GGP disclosed why funds that had been withheld and escrowed under the 2018 Debenture Agreement and the Amended Debenture Agreement, approximately US$5.72 million, were not used to satisfy iAnthus' interest obligations as intended. That money, purportedly set aside under those agreements in the event of the Company's interest payment default, was adequate to make the US$4.4 million payments due to GGP in March 2020.

58.    News of the default and the investigation had an immediate negative impact on iAnthus' stock – the price of the Company's common shares fell from a close of US$0.469 per share on April 3, 2020, the last trading day before the announcement, to a close of US$0.179 per share on April 6, 2020, a 62% fall on unusually high trading volume.

## IV.    The Fallout Continues and Ford is Forced Out

59.    On April 22, 2020, iAnthus announced that Canaccord Genuity Corp. had been hired as its financial advisor in connection with reviewing potential strategic transactions involving the Company.

60.    On April 27, 2020, iAnthus' Board issued a press release outlining the Special Committee's findings and confirming Ford's improper conduct:

> The Special Committee concluded that Defendant Ford indeed entered into two undisclosed loans (one loan for US$100,000.00 with a related-party and the other for US$60,000.00 with a non-arm's length party) and those loans created a potential or apparent conflict and should have been disclosed to the Board in a timely way.
>
> With respect to the loan with the related-party, the Online Report included an allegation that Mr. Ford entered into an undisclosed loan transaction with the managing member (the "Managing Member") of iAnthus' senior secured lender, Gotham Green Partners ("Gotham Green").  The Special Committee considered the allegation and the relevant details, are summarized as follows:
>
> - On December 20, 2019 (the "December 2019 News Release"), iAnthus and Gotham Green closed an additional US$36.15 million of senior secured convertible notes from Gotham Green and additional co-investors (the "Third Tranche").

17

> ▪ A day after the close of the Third Tranche, on December 21, 2019, Ford (as borrower) and the Managing Member (as lender), entered into a loan for the principal sum of US$100,000, documented by an email. The loan bore no interest and was to be repayable on March 31, 2020. The loan has not been repaid.

> […] The Special Committee concluded, and the Board accepted, that the failure to disclose such personal loans to the Board was a breach of the Company's conflict policies and other obligations as an officer and director of the Company.

61.     Upon information and belief, the Special Committee reviewed at least certain of the undisclosed loans entered into by Ford with Adler and Rosinov, and determined that they violated both Company policies and Ford's obligations as an officer and director.

62.     On the same day, and as a result of his misconduct, Ford immediately resigned as Chief Executive Officer and from all positions with the Company and its subsidiaries.  Maslow was appointed as the Interim Chief Executive Officer upon Ford's departure.

63.     On May 8, 2020, iAnthus announced the resignation of independent director Mark Dowley from the Board.  Mr. Dowley was on the Special Committee appointed to investigate Defendant Ford's misconduct.

64.     On May 18, 2020, Hi-Med served iAnthus with a Notice of Default and Acceleration in compliance with Section 7.1(3) of Article 7 of the Hi-Med Debenture.

## THE MATERIALLY FALSE AND MISLEADING STATEMENTS

65.     Defendants' statements in the Arrangement Agreement and Purchase Agreement concerning the financings described above were materially false and misleading. Specifically, Defendants represented that:

> • Since the date of the last iAnthus Group Filing, other than the transactions contemplated by this Agreement, there has not been any event, occurrence, fact, effect or circumstance that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect with respect to iAnthus Group (Arrangement Agreement, Schedule D(r));

18

- All accounting and financial Books and Records of iAnthus Group have been maintained in accordance with sound business practices (Arrangement Agreement, Schedule D(u));

- Except for Contracts made solely among iAnthus Group, iAnthus Group does not have any Non-Arm's Length Agreements and no non-scheduled payments (including payments in connection with the termination of a Non-Arm's Length Agreement) have been made under any Non-Arm's Length Agreement since December 31, 2017, except as set out in Section 3.2(mm) of the iAnthus Disclosure Letter (Arrangement Agreement, Schedule D(mm)).

- The Disclosure Documents are, as of the date of such information, true and correct in all material respects and do not contain a misrepresentation, and no material fact or facts have been omitted therefrom where such omission would make such information materially misleading (Purchase Agreement, Section 4.15(c)); and

- There are no off-balance sheet transactions, arrangements or obligations (including contingent obligations) of the Company or any Subsidiary with unconsolidated entities or other persons that could reasonably be expected to have a Material Adverse Effect (Purchase Agreement, Section 4.15(e)).

66.     As detailed above, Defendants failed to disclose that iAnthus' relationship with GGP was not arm's-length and the financings (totaling more US$100 million) from GGP were the fruit of improper insider self-dealing between Ford and Adler.

67.     Moreover, the statements concerning the escrowed US$5.72 million set forth in the 2018 Debenture Agreement and the Amended Debenture Agreement, described above, were materially false and misleading. Those agreements specifically provided that a certain portion of the proceeds of the 2018 Debenture and/or the 2019 Debenture were to be withheld and placed into escrow:

> to ensure the timely payment of one (1) year's accrued interest on the Debentures in the event that the Issuer does not have sufficient funds to satisfy such interest obligations in accordance with the Debentures.

2018 Debenture Agreement, § 4.20(i); Amended Debenture Agreement, § 4.20(i).  Moreover, under those agreements, use of the escrowed funds to avoid default on the interest payments was mandatory:

If the Issuer does not have sufficient funds to satisfy such interest obligations under the Debentures, whether during the first year of the term of the Debentures or thereafter, then the Issuer and the Lenders ***shall direct the Escrow Agent*** in writing in accordance with the Escrow Agreement ***to release funds from the Interest Payment Escrow to satisfy such interest obligations***.

*Id*. (emphasis added)

68.     However, the escrowed US$5.72 million was not used to make the March 31, 2020 payments on the 2018 and 2019 Debentures because, upon information and belief, the Escrowed Funds had been exhausted to satisfy other iAnthus debts.

69.     Defendants failure to disclose that they had violated the 2018 Debenture Agreement and/or the Amended Debenture Agreement, the Arrangement Agreement, and the Purchase Agreement by engaging in a non-arm's length relationship with its primary funding source, engaging in improper self-dealing, and failing to set aside or exhausting the Interest Escrow Payment, was an omission of material fact that rendered the statements made by iAnthus in the 2018 Debenture Agreement and the Amended Debenture Agreement, the Arrangement Agreement, and Purchase Agreement materially false and misleading.

## LOSS CAUSATION

70.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused economic loss suffered by Hi-Med.

71.     Over the course of 2018 and 2019, Hi-Med purchased US$5 million and agreed to a conversion of its MPX common stock into iAnthus stock at artificially inflated prices and were damaged thereby. Fundamental to Hi-Med's agreement to vote in favor of the Arrangement Transaction and with the conversion of its MPX equity and its purchase of the Hi-Med Debenture, was its reliance on iAnthus' representations in the 2018 Debenture Agreement and/or Amended Debenture Agreement, the Arrangement Agreement, and Purchase Agreement. If not for the

Defendants' deception, Hi-Med would never have agreed to the conversion or its subsequent purchase of a US$5 million unsecured convertible debentures from iAnthus.

72.     The price of the Company's common stock significantly declined by approximately 62% upon the Company's April 6, 2020 announcement that it (a) had not directed release of the Interest Payment Escrow to satisfy the Company's interest payment obligations to GGP, thereby defaulting under the 2018 and 2019 Debenture Agreements with GGP, and (b) that it was investigating misconduct on the part of its CEO, Defendant Ford, which was determined to have occurred. Hi-Med's losses were inextricably caused by Defendants' materially false and misleading statements.

**SCIENTER ALLEGATIONS**

73.     The Individual Defendants acted with scienter because either they: (i) were signatories to the operative documents discussed herein, including the 2018 Debenture Agreement and/or Amended Debenture Agreement, the Arrangement Agreement, the Hi-Med Debenture and the Purchase Agreement; (ii) knew that US$5.72 million had been withheld from the 2018 Debenture and/or the 2019 Debenture to ensure the Company's payment of its interest obligations under the agreements; (iii) knew that the use of the Interest Payment Escrow to meet the Company's interest obligations under the 2018 Debenture Agreement and/or the Amended Debenture Agreement was contractually required; (iv) knew that the amount of the Interest Payment Escrow, US$5.72 million, was adequate to make the March 2020 interest payment of US$4.4 million to GGP; (v) knew that they had not directed the Escrow Agent to release the Interest Payment Escrow to make the March 2020 interest payments; (vi) knew that the statements in the 2018 Debenture Agreement and the Amended Debenture Agreement were materially false and misleading because Defendants failed to disclose that that the Escrowed Funds were exhausted, diminished or otherwise unavailable to satisfy the Company March 2020 interest

payment obligations; (vii) improperly directed payment of the Company's funds to the Stavola Trust in exchange for Stavola's complicity; (viii) knew that such statements would be issued or disseminated to the investing public through the CSA's SEDAR system; (ix) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws; and/or (x) knew that a failure to make the March 2020 interest payment would cause the Company's stock price to precipitously fall, priming iAnthus' shareholders for Ford's and Maslow's Potential MBO.

74.     As set forth herein, the Individual Defendants, as signatories to the 2018 Debenture Agreement and/or the Amended Debenture Agreement and/or through their conduct, approved the issuance of the statements concerning the Interest Payment Escrow, and knew that the escrowed funds were unavailable to make the Company's March 31, 2020 interest payments to GGP.

75.     The Individual Defendants' positions and roles with the Company gave them unique knowledge of the material false or misleading public statements which they failed to correct.

76.     Defendants Ford and Adler acted with scienter because of their knowledge of the non-arm's-length relationship between iAnthus and GGP and their improper insider self-dealing.

77.     Stavola's position with the Company as Chief Strategy Officer, her role as director, and her complicity in exchange for payment of a significant loan to the Stavola Trust gave her knowledge of the materially false or misleading public statements which she failed to correct.

78.     Galvin's role as a director gave him knowledge of the materially false or misleading public statements which he failed to correct.

79.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is within Defendants' knowledge and control.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

80.     At all relevant times, the market for the Company's common stock was an efficient

market for the following reasons, among others:

- iAnthus common stock was traded on the CSE in Canada and the over-the-counter in the United States, with substantial trading volume throughout the relevant time period;

- As a regulated issuer, iAnthus filed regular periodic public reports with the CSA on SEDAR, including the Arrangement Agreement;

- iAnthus regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- iAnthus was followed by several securities analysts during the relevant time period, including Northland Capital Markets, PI Financial, Echelon Wealth Partners, Canaccord Genuity, and Cormark Securities, whose publicly available reports and analyses entered the public marketplace.

81.     As a result of the foregoing, the market for iAnthus' common stock promptly

digested current information regarding the Company from all publicly-available sources and

reflected such information in the Company's stock price. For example, the price of iAnthus

common stock fell from a close of US$0.469 per share on April 3, 2020, the last trading day

before the announcement of the Company's default on its interest payments to GGP and

investigation into Ford's improper self-dealing, to a close of US$0.179 per share on April 6, 2020,

a 62% drop on unusually high trading volume.

82.     As detailed above, Defendants made public misrepresentations or failed to disclose

material facts; these omissions and misrepresentations were material and would tend to induce a

reasonable investor to misjudge the value of the Company's securities; iAnthus securities are

traded in an efficient market; the Company's shares were liquid and traded with heavy volume

during the relevant time period; and Hi-Med converted its MPX shares to iAnthus shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

83.     Based upon the foregoing, Plaintiff is entitled to a presumption of reliance upon the integrity of the market.

## NO SAFE HARBOR

84.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made and involve statements of historical fact, such as the existence of the Interest Payment Escrow and the obligation under the terms of the 2018 and Amended Debenture Agreements to release the Interest Payment Escrow in the event that iAnthus lacked sufficient funds to meet its interest payment obligations.

## FIRST CLAIM

### Violation of Section 10(b) Of The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

85.     Defendants carried out a plan, scheme and course of conduct that was intended to and did: (i) deceive Hi-Med as alleged herein; and (ii) cause Hi-Med to agree to vote in favor of the Arrangement Transaction and convert its MPX common shares into iAnthus common shares and hold these shares at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

86.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Hi-Med in an effort to maintain artificially high market prices

for iAnthus' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

87.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about iAnthus' relationship with GGP, and its financial condition and ability to satisfy its interest payment obligations under the 2018 Debenture Agreement and/or the Amended Debenture Agreement as specified herein.

88.     Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Hi-Med that it had obtained all of its financings as arms-length transactions and of iAnthus' ability to satisfy its obligations under the 2018 Debenture Agreement and/or the Amended Debenture Agreement, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Hi-Med.

89.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of the Company's common stock. Information showing that Defendants acted knowingly or with reckless disregard for the truth is within Defendants' knowledge and control.

90.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of iAnthus' common stock was artificially inflated during the relevant period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material, adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the relevant period that Hi-Med acquired iAnthus' common stock at artificially high prices and was damaged thereby.

91.     At the time of said misrepresentations and omissions, Plaintiff was ignorant of the falsity of the statements, and believed them to be true. Had Plaintiff and the marketplace known the truth regarding the non-arm's length relationship between iAnthus and GGP, and the truth regarding the Interest Payment Escrow under the 2018 Debenture Agreement and the Amended Debenture Agreement, which were not disclosed by Defendants, Plaintiff would not have converted its MPX common shares into iAnthus common shares or purchased the US$5 million debenture, or, if it had converted such common stock and purchased such debenture, it would not have done so at the artificially inflated prices.

92.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

93.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its acquisition of iAnthus' common stock and purchase of its debenture.

**WHEREFORE**, Hi-Med prays for relief and judgment, as follows: Awarding damages in favor of Plaintiff against all Defendants for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon; Awarding Hi-Med reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and Such other and further relief as the Court may deem just and proper.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against Defendants Ford, Kalcevich, Stavola, Galvin, and Maslow

94.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.    Defendants Ford, Kalcevich, Stavola, Galvin, and Maslow acted as controlling persons of iAnthus within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their execution of the operative documents discussed herein, including, but not limited to, the 2018 Debenture Agreement and/or the Amended Debenture Agreement on behalf of iAnthus, high-level positions, and/or intimate knowledge of the false statements in connection with the Interest Payment Escrow, the Arrangement Agreement, the 2018 Debenture Agreement and/or the Amended Debenture Agreement that were disseminated to the investing public, Defendants Ford, Kalcevich, Stavola, Galvin, and Maslow had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the 2018 Debenture Agreement and the Amended Debenture Agreement which Plaintiff contends are false and misleading. Defendants Ford and Kalcevich executed the 2018 Debenture Agreement and/or the Amended Debenture Agreement on behalf of iAnthus, which included the statements that Hi-Med alleges are materially false and misleading, and had the ability to cause the statements to be corrected.

96.    In particular, the Defendants Ford, Stavola, Galvin, Maslow, and Kalcevich, had direct and supervisory involvement in the day-to-day operations of the Company and, therefore,

are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

97.     Defendants Ford, Kalcevich, Stavola, Galvin, and Maslow had a duty to disseminate accurate and truthful information with respect to iAnthus' financial condition and results of operations, and to promptly correct any public statements issued by iAnthus which are, or became, materially false or misleading.

98.     As set forth above, Defendants Ford, Kalcevich, Stavola, Galvin, and Maslow violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants Ford, Kalcevich, Stavola, Galvin, and Maslow are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the wrongful conduct of Defendants Ford, Kalcevich, Stavola, Galvin, and Maslow, Plaintiff suffered damages in connection with its acquisitions of iAnthus common shares and purchase of its debenture.

**WHEREFORE**, Hi-Med prays for relief and judgment, as follows: Awarding damages in favor of Plaintiff against these defendants for all damages sustained as a result of their wrongdoing, in an amount to be proven at trial, including interest thereon; Awarding Hi-Med reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and such other and further relief as the Court may deem just and proper.

### THIRD CLAIM

### Breach of Contract Against iAnthus

**A.  Breach of the Hi-Med Debenture**

99.     Hi-Med incorporates and re-alleges the allegations contained in preceding paragraphs as if set forth in full herein.

100.     On March 15, 2019, Hi-Med and iAnthus entered into the Hi-Med Debenture. Under the Hi-Med Debenture, Hi-Med loaned iAnthus a principal amount of US$5,000,000 in exchange for Hi-Med receiving certain rights, including warrants and the right to receive interest payments at a rate of eight percent (8.00%) per annum, calculated and payable quarterly.  The Hi-Med Debenture's maturity date was March 15, 2023.

101.     Under the Hi-Med Debenture, iAnthus agreed to keep adequate and accurate records and books of account in which complete entries would be made reflecting all financial transactions.  *See* Article 6, Section 6.1(3).

102.     Under the Hi-Med Debenture, iAnthus agreed to promptly pay when due all principal, interest and other amounts owed to Hi-Med.  *See* Article 6, Section 6.1(5).

103.     Under the Hi-Med Debenture, iAnthus agreed to promptly perform and satisfy all covenants and obligations to be performed under the Hi-Med Debenture.  *See* Article 6, Section 6.1(6).

104.     Hi-Med fully performed under the Hi-Med Debenture by providing the entire principal amount to iAnthus.

105.     Article 7 of the Hi-Med Debenture, *inter alia*, defines "Events of Default" and grants Hi-Med the right, under certain conditions to accelerate the principal amount and any and all accrued interest due from iAnthus:

- Section 7.1(1)(b) of Article 7 declares iAnthus in default in the event that iAnthus fails to pay Hi-Med "any interest or other amount" owed by iAnthus to Hi-Med "when due."

- Section 7.1(1)(c) of Article 7 declares iAnthus in default in the event that iAnthus "fails to … comply with any … covenant … contained herein or is otherwise in default of any of the provisions contained herein," and "such default, if capable of being remedied, is not remedied within ten (10) days after [iAnthus] receives written notice of such default from [Hi-Med]."

- Section 7.1(1)(d) of Article 7 declares iAnthus in default if iAnthus "shall generally fail to pay, or admit in writing its inability or unwillingness to pay, debts as they become due[.]"

- Section 7.1(3) of Article 7 provides that if iAnthus defaults "for any reason, whether voluntary or involuntary, and be continuing, [Hi-Med] may by notice to [iAnthus] declare all or any portion of the outstanding Principal Amount of [the Hi-Med] Debenture and accrued interest on this [Hi-Med] Debenture to be due and payable, whereupon the full unpaid amount of this [Hi-Med] Debenture which shall be so declared due and payable shall be and become immediately due and payable without further notice, demand or presentment."

106.    On March 31, 2020, iAnthus failed to pay Hi-Med its quarterly interest payment, which triggered the "Events of Default" defined in Section 7.1(1)(b) and (c) of Article 7 of the Hi-Med Debenture.

107.    iAnthus and GGP entered into the GGP Debenture on May 14, 2018.  Under the GGP Debenture, GGP loaned iAnthus a principal amount of US$28,400,000, in exchange for GGP receiving certain rights, including warrants and the right to receive interest payments at a rate of thirteen percent (13.00%) per annum, calculated and payable quarterly.

108.    iAnthus and GGP entered into the GGP Second Amended Debenture on October 10, 2019, which became effective on September 30, 2019.  Under the GGP Second Amended Debenture, GGP loaned iAnthus a principal amount of US$40,000,000, in exchange for GGP receiving certain rights, including warrants and the right to receive interest payments at a rate of thirteen percent (13.00%) per annum, calculated and payable quarterly.

109.    On April 6, 2020, iAnthus announced that it did not make the applicable interest payments to GGP under the Amended Debenture Agreement that were due on March 31, 2020 and announced a Special Committee to investigate wrongdoing which ultimately led to the ouster of Ford.  While the Company ascribed its inability to make the payments to the "decline in the overall public equity cannabis markets, coupled with the extraordinary market conditions that began in Q1 2020 due to the novel coronavirus known as COVID-19 ("COVID-19") pandemic" that caused

liquidity constraints for iAnthus, it became clear that the escrow created to cover this payment was either not established or not used for its intended purpose and that the default resulted from a conspiracy between GGP and iAnthus' conflicted management.

110.   In fact, iAnthus' default announcement was coupled with the extraordinary revelation that the Company had formed the Special Committee to investigate related-party transactions involving Ford, made public on a March 31, 2020 online media report, and review strategic alternatives available to the Company.

111.   It was later learned that Defendants Ford and Maslow had recused themselves from the Board meeting in which the Special Committee was appointed because they had begun exploring the Potential MBO in coordination with GGP.   Based on materials detailing the Potential MBO, GGP's investment(s) would have been purchased at a *3% premium* while the investments of other bondholders (including Hi-Med) would be purchased at a *40% discount*.

112.   Moreover, neither the Company nor GGP disclosed why funds that had been withheld and escrowed under the 2018 Debenture Agreement and the Amended Debenture Agreement, approximately US$5.72 million, were not used to satisfy iAnthus' interest obligations. That money, purportedly set aside under those agreements in the event of the Company's interest payment default, was adequate to make the US$4.4 million payments due to GGP in March 2020. Defendants also never disclosed that the escrowed funds had ever been diminished, exhausted or were otherwise unavailable to satisfy its interest payment obligation to GGP.

113.   As noted above, iAnthus' Board issued a press release outlining the Special Committee's findings and confirming Ford's improper conduct.

114.   On May 18, 2020, Hi-Med served iAnthus with a Notice of Default and Acceleration in compliance with Section 7.1(3) of Article 7 of the Hi-Med Debenture.

115.   iAnthus has breached, and continues to breach, the Hi-Med Debenture by failing to pay Hi-Med the principal amount of US$5,000,000 in addition to any and all interest due to Hi-Med.

116.   iAnthus has breached, and continues to breach, the Hi-Med Debenture by failing to make required interest payments to all other debenture holders, including those payments required under the GGP Second Amended Debenture.

117.   iAnthus has breached, and continues to breach, the Hi-Med Debenture by admitting its inability and/or unwillingness to make required interest payments to all other debenture holders, including those payments required under the GGP Second Amended Debenture.

118.   iAnthus has breached, and continues to breach, the Hi-Med Debenture by its failure to keep adequate and accurate records and books of account through the misconduct detailed above.

119.   As a result of iAnthus' breaches, Hi-Med has and will continue to suffer damages as a result therefrom, and pursuant to the Hi-Med Debenture, Hi-Med is owed the entire outstanding and unpaid principal amount and accrued and unpaid interest thereon be due and payable to Hi-Med.

120.   Furthermore, Hi-Med is entitled to reimbursement of its reasonable attorney's fees and costs expended in bringing this action to enforce the Hi-Med Debenture.

**B.  <u>Breach of the Purchase Agreement</u>**

121.   Hi-Med incorporates and re-alleges the allegations contained in preceding paragraphs as if set forth in full herein.

122.   On March 15, 2019, Hi-Med and iAnthus entered into the Purchase Agreement.

123.    The Purchase Agreement, *inter alia*, provided that iAnthus would make the aforementioned quarterly interest payments to Hi-Med upon the terms and conditions of the Hi-Med Debenture.

124.    The Purchase Agreement, *inter alia*, provided:

> The Disclosure Documents are, as of the date of such information, true and correct in all material respects and do not contain a misrepresentation, and no material fact or facts have been omitted therefrom where such omission would make such information materially misleading (Purchase Agreement, Section 4.15(c)); and

> There are no off-balance sheet transactions, arrangements or obligations (including contingent obligations) of the Company or any Subsidiary with unconsolidated entities or other persons that could reasonably be expected to have a Material Adverse Effect (Purchase Agreement, Section 4.15(e)).

125.    Hi-Med fully performed under the Purchase Agreement by providing the entire principal amount to iAnthus as required by the Purchase Agreement.

126.    The "Events of Default" set forth in the Hi-Med Debenture are incorporated as "Events of Default" under the Purchase Agreement. *See* Section 6.1(e) of Article 6.

127.    The Purchase Agreement defines the following, among others, as an "Event of Default," "Nonpayment of Loans and Other Liabilities. Default in the payment . . . (ii) of any interest or any fees or any other amounts payable by [iAnthus] to [Hi-Med] . . . within ten (10) Business Days of then due.  *See* Section 6.1(a) of Article 6.

128.    The Purchase Agreement also defines the following, among others, as an "Event of Default," "Representations and Warranties. Any representation or warranty made by Company herein or in any Transaction Document is breached or was false or misleading in any material respect when made, or any schedule, certificate, financial statement, report, notice, or other writing furnished to Lender by Company or any Guarantor is false or misleading in any material respect on the date as of which the facts therein set forth are stated or certified." *See* Section 6.1(d) of Article 6.

129.    On March 31, 2020, iAnthus failed to pay Hi-Med its quarterly interest payment and Hi-Med has not been paid to date, which triggered the "Events of Default" defined in Section 6.1(a) and (e) of Article 6 of the Purchase Agreement.

130.    As mentioned above, on April 6, 2020, iAnthus publicly announced that iAnthus did not fund the March 31, 2020 interest payments owed to all debenture holders and that the period to cure such defaults to the secured debenture holders had expired.  iAnthus' defaults included the failure to make the required interest payments under the GGP Second Amended Debenture.

131.    iAnthus' April 6, 2020 announcement of iAnthus' failure to make the March 31, 2020 interest payments, including those required under the GGP Second Amended Debenture, triggered the "Event of Default" defined in Section 7.1(1)(d) of Article 7 of the Hi-Med Debenture, which, in turn, constitutes the "Event of Default" defined in Section 6.1(e) of Article 6 of the Purchase Agreement.

132.    iAnthus has breached, and continues to breach, the Purchase Agreement by failing to pay Hi-Med the principal amount of US$5,000,000 in addition to any and all interest due to Hi-Med.

133.    iAnthus has breached, and continues to breach, the Purchase Agreement by failing to make required interest payments to all other debenture holders, including those payments required under the GGP Second Amended Debenture.

134.    iAnthus has breached, and continues to breach, the Purchase Agreement by admitting its inability and/or unwillingness to make required interest payments to all other debenture holders, including those payments required under the GGP Second Amended Debenture.

135.    iAnthus has breached, and continues to breach, the Purchase Agreement through its false and misleading statements and representations as detailed above.

136.    As a result of iAnthus' breaches, Hi-Med has and will continue to suffer damages as a result therefrom, and pursuant to the Purchase Agreement, Hi-Med is owed the entire outstanding and unpaid principal amount and accrued and unpaid interest thereon be due and payable to Hi-Med.

137.    Furthermore, Hi-Med is entitled to reimbursement of its reasonable attorney's fees and costs expended in bringing this action to enforce the Purchase Agreement.

**WHEREFORE**, Hi-Med demands judgment against iAnthus for breaches of the Hi-Med Debenture and the Purchase Agreement in the full principal amount, as well as incidental damages, pre- and post-judgment interest, attorney's fees, and such other and further relief as the Court deems just and equitable.

## FOURTH CLAIM

### Tortious Interference with Contract and Prospective Economic Advantage Against Defendants GGP and Adler

138.    Hi-Med incorporates and re-alleges the allegations contained in preceding paragraphs as if set forth in full herein.

139.    MPX and iAnthus entered into the Arrangement Agreement on October 18, 2018, through which Hi-Med's investment in MPX was converted to equity, thereby making Hi-Med the largest equity stakeholder in iAnthus' common stock.

140.    Hi-Med and iAnthus entered into the Hi-Med Debenture and Purchase Agreement, both valid and enforceable contracts, on March 15, 2019.  GGP and Adler knew of the existence of the Arrangement Agreement and stock conversion, the Hi-Med Debenture and the Purchase Agreement.

141.   GGP and Adler, intentionally procured, induced, or caused, without economic justification, iAnthus to breach the Hi-Med Debenture and Purchase Agreement.

142.   GGP and Adler's intentional and unjustified actions caused and will continue to cause Hi-Med to suffer damages.

143.   MPX and iAnthus entered into the Arrangement Agreement on October 18, 2018, through which Hi-Med's investment in MPX was converted to the largest equity stake in iAnthus' common stock.

144.   Hi-Med reasonably expected the bargained for benefit of its converted equity in iAnthus.

145.   Hi-Med and iAnthus entered into the Hi-Med Debenture and Purchase Agreement, both valid and enforceable contracts, on March 15, 2019.

146.   Hi-Med reasonably expected to receive its bargained for interest payments as well as the principal amount on the Hi-Med Debenture's maturity date.

147.   Hi-Med reasonably expected to exercise its rights under the warrants provided for in the Hi-Med Debenture and Purchase Agreement.

148.   GGP and Alder knew of the existence of the Arrangement Agreement and stock conversion, the Hi-Med Debenture and the Purchase Agreement.

149.   GGP and Adler, intentionally procured, induced, or caused, without economic justification, iAnthus to breach the Arrangement Agreement and Hi-Med Debenture and Purchase Agreement with Hi-Med.

150.   GGP and Adler, through their actions of direct interference with iAnthus' relationship with Hi-Med, employed wrongful means and/or acted for the sole purpose of inflicting intentional harm on Hi-Med.

151.    GGP's and Adler's intentional, wrongful and unjustified actions caused and will continue to cause Hi-Med to suffer damages.

**WHEREFORE**, Hi-Med demands judgment against GGP and Adler for tortious interference with contract and prospective economic advantage and compensatory damages for the full principal amount, as well as incidental damages, pre- and post-judgment interest, attorney's fees, injunctive relief, punitive damages and such other and further relief as the Court deems just and equitable.

## FIFTH CLAIM

### Common Law Fraud Against All Defendants

152.    Hi-Med incorporates and re-alleges the allegations contained in preceding paragraphs as if set forth in full herein.

153.    GGP and Adler, in combination with others at iAnthus, Ford, Kalcevich, Stavola, Galvin, and Maslow, substantially assisted in carrying out a plan, scheme, artifice, and course of conduct to falsify iAnthus' financial outlook, which Defendants intended to be and reasonably knew would be relied upon by Hi-Med to enter into the Hi-Med Debenture, the Purchase Agreement and its prior purchase/conversion of iAnthus stock.

154.    Further, GGP and Adler, in combination with others at iAnthus, Ford, Kalcevich, Stavola, Galvin, and Maslow, substantially assisted in carrying out a plan, scheme, artifice, and course of conduct to coordinate the intentional non-payment of interest due to debenture holders in an effort to decrease the value of Hi-Med's stock and the Hi-Med Debenture all while paving the way for the intended MBO.

155.    GGP and Adler, in combination with others at iAnthus, Ford, Kalcevich, Stavola, Galvin, and Maslow, repeatedly made false statements of material fact and/or omitted material facts necessary in order to make the statements made, in light of the circumstances under which

they are made, not misleading and engaged in acts and practices which operated as a fraud in an effort to conceal their true nefarious motive to facilitate the intended MBO.

156.   Such false and misleading statements of fact and/or material omissions were material to Hi-Med in its decision to enter into the Hi-Med Debenture, Purchase Agreement and prior conversions to iAnthus common stock.

157.   Hi-Med reasonably relied upon GGP's, Adler's, iAnthus', Ford's, Kalcevich's, Stavola's, Galvin's, and Maslow's materially false and misleading misrepresentations and/or material omissions of fact.

158.   Hi-Med suffered damages as a result of GGP's, Adler's, iAnthus', Ford's, Kalcevich's, Stavola's, Galvin's, and Maslow's materially false and misleading statements and/or material omissions of fact.

**WHEREFORE**, Hi-Med demands judgment against Defendants for common law fraud and seeks compensatory damages in the full principal amount, as well as incidental damages, pre- and post-judgment interest, attorney's fees, injunctive relief, punitive damages and such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:   May 19, 2020

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP

By: _____

Richard J. L. Lomuscio
(rlomuscio@riker.com)
Michael O'Mullan
(momullan@riker.com)

500 Fifth Avenue, 49th Floor
New York, New York 10110
Telephone:  (212) 302-8255
Facsimile:  (973) 451-3860

*Attorneys for Plaintiff HI-MED LLC*